[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 27, 2004
THOMAS  K. KAHN
CLERK

No. 03-11960

D. C. Docket No. 02-01354-CV-AR-J

BELINDA HULSEY,

Plaintiff-Appellant,

versus

PRIDE RESTAURANTS, LLC,
d.b.a. Burger King,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

**(April 27, 2004)**

Before CARNES and WILSON, Circuit Judges, and JORDAN[*], District Judge.

CARNES, Circuit Judge:

_____

[*]Honorable Adalberto Jordan, United States District Judge for the Southern District of
Florida, sitting by designation.

This is Belinda Hulsey's appeal from a summary judgment entered against her in the Title VII sexual harassment lawsuit she filed against her former employer. In deciding her appeal, we view the evidence the way the district court should have viewed it, which means that we construe it in the light most favorable to her as the non-movant. See Hyman v. Nationwide Mut. Fire Ins. Co., 304 F.3d 1179, 1185 (11th Cir. 2002). We cannot tell how the district court viewed the evidence, or much else about its reasoning, because of the cursory nature of its order granting summary judgment. We can tell, however, that the court should not have thrown out Hulsey's case without a trial.

## I.

Belinda Hulsey applied to work at a Burger King restaurant in Jasper, Alabama on July 7, 2001. The restaurant was one of nine in Alabama owned and managed by Pride Restaurants, LLC. Tim Garrison, an assistant manager who supervised the night shift at the Jasper Burger King, interviewed Hulsey and hired her the next day. Hulsey told Garrison that she needed to work the night shift, because her younger sister Krystal already did and their grandmother could drive the two sisters home from the restaurant together each night. At the time Hulsey began working at the restaurant, she was 17 years old. Garrison was either 20 or 21.

2

About ten to fourteen days after Hulsey began working, Garrison expressed a desire to date her. He told Krystal that if she could get her sister to date him, he would set up Krystal with his brother Adam in return. Hulsey rejected the overture. She had Krystal tell Garrison that she was not interested, and that she already had a boyfriend.

The night after Krystal told Garrison that Hulsey was not interested in him, the three were closing the restaurant together. Garrison tried to persuade Hulsey and Krystal to ride home with him and Adam after work, even though the girls' grandmother was waiting for them in the parking lot. Hulsey told Garrison that she "didn't want him, that he was [her] boss," and the girls then left with their grandmother.

Not willing to take no for an answer, Garrison stayed after Krystal – in Hulsey's words, he "kept on and on and on about it" – to convince Hulsey to change her mind about dating him. Hulsey would not budge. On five or six occasions Garrison tried to convince Hulsey to break up with her boyfriend and date him, promising that he would "show [her] what a man really was." Unimpressed with that prospect, Hulsey declined all those offers.

Garrison's conduct became more offensive. He cut Krystal's hours to one day per week so that Hulsey would work with him, and she would be "basically

the only girl that he put working [on the] night shift." That meant she was left to work with Garrison, his brother Adam, and his cousin Rusty. One night Garrison asked Hulsey to come to the back of the restaurant to "do a quickie . . . before his brother came back" from taking out the garbage. She refused. On two or three other occasions while she was cleaning up the restaurant, Garrison told her he could drive her home "and on the way we could stop and do it." She refused. Another time, Garrison told Hulsey, "come on, let's go to the bathroom and I'll show you how much of a man I am." She refused.

On two occasions Garrison approached Hulsey from behind while she was sweeping or mopping and tried to touch her breasts by reaching over her shoulder and putting his hand down the top of her shirt. She pushed him away both times. Once or twice after closing time, Garrison even followed Hulsey into a stall in the women's restroom where she had gone to relieve herself, causing her to leave prematurely.

Twice Garrison tried to pull Hulsey's pants down. The first time, Adam grabbed Hulsey and wrapped his arms around her while Garrison pulled at the front of her pants above her knees. Rusty and Hulsey's female cousin Shay both observed the incident and laughed while Hulsey struggled with the Garrison brothers and hollered for them to let her go. They kept at it until a customer

4

walked in the door.  The second time, Garrison approached Hulsey from behind while she was cleaning a bathroom stall, took hold of her pants on both sides, and tried to pull them down.  Hulsey had to turn and knee him in the groin to escape.

On two other occasions, Garrison attempted to put his hands down the front of Hulsey's pants and grope her between the legs while she was cleaning the restaurant.  The first time this happened she elbowed him in the chest and told him to get away from her.  Adam and Rusty, the only other people in the restaurant, observed the incident and laughed.  The second time it happened Hulsey, Garrison, Adam, and Rusty were again the only people in the restaurant.  And once again Garrison reached around Hulsey and tried to put his hand down the front of her pants.  Hulsey kneed him between the legs and told him to leave her alone.  After these incidents, Hulsey spoke to Adam and asked him to tell Garrison to leave her alone, to which Adam's astute response was:  "[M]y brother wants to date you."  Hulsey characterized Garrison's conduct as an "every-night thing when he would say stuff to me and do stuff."

While Hulsey was working her shift on the night of August 16, 2001, one of her sisters called and told her that some of Hulsey's family members would be stopping by the restaurant on their way in from Florida later that night.  Hulsey asked Garrison if she could take her break when they arrived so she could visit

5

with them. He told her that she could. But when Hulsey's relatives arrived Garrison told her that, "the only way you can go on break is if I get into your pants after work." Hulsey rejected the offer and walked from behind the counter to say goodbye to her relatives since she would not be allowed to visit with them. As Hulsey walked toward her family, Garrison told her that she "might as well clock out." Hulsey asked him if that meant she should clock out for a break, to which Garrison responded: "[N]o, you're fired."

Although Hulsey did not inform any member of Pride management about Garrison's conduct during her employment, she did file a complaint with the Jasper police department on August 17, 2001 – the day after she was fired – in which she alleged conduct similar to that described in her complaint. Hulsey also filed a complaint with the EEOC on August 31, 2001. The record does not reveal whether either complaint was ever investigated.

Pride first learned of Hulsey's problems with Garrison several days <u>after</u> her termination when she reported allegations of sexual harassment to Hillary Larry, the manager of a Burger King in Hoover, Alabama. Larry relayed these allegations to Nicole Whitmore, Pride's human resources manager. Whitmore then began an internal investigation of Hulsey's claims. She interviewed Hulsey by telephone and met individually with all the employees at the Jasper Burger

6

King. Whitmore ultimately concluded that she could not corroborate Hulsey's allegations and Pride took no disciplinary action against Garrison at that time, though Pride later fired him for improper cash handling.

**II.**

Hulsey filed a five-count complaint in the Northern District of Alabama against Garrison and Pride. The complaint alleged violations of Title VII, 42 U.S.C. § 2000e et seq., and included four pendent state law claims. Hulsey asserted that the harassment she suffered "was sufficiently severe, pervasive, and extreme so as to alter the terms and conditions of her employment." She also stated that she "was terminated from her employment as a direct and proximate result of having rebuffed Garrison's advances." She requested injunctive and declaratory relief, monetary damages, and attorney's fees and costs.

The district court entered a default judgment against Garrison for failing to answer the complaint. After discovery, Pride moved for summary judgment on both the Title VII and state law claims. With regard to the Title VII claim, Pride contended that Hulsey's claim should fail because she did not report any alleged harassment until after her employment ended, and because she did not show that Garrison's conduct was severe and pervasive enough to constitute a Title VII violation. Specifically, Pride claimed that Hulsey failed to prove that she

subjectively viewed Garrison's conduct as offensive because she did not report his conduct to Pride management until after her termination. Pride also contended that Garrison's conduct, which Pride characterized as a "handful of childish comments and workplace horseplay between teenagers," was not objectively severe and pervasive.

Hulsey answered that she had established an actionable hostile work environment because she subjectively perceived Garrison's conduct as abusive, and because his repeated harassing conduct in his position as a supervisor was objectively hostile and abusive. Hulsey also argued that Pride was strictly liable for Garrison's actions as a supervisor because Garrison fired her after she refused his sexual advances. Pride's summary judgment reply brief did not address Hulsey's strict liability theory.

The district court granted Pride's motion for summary judgment, providing only the following two-sentence explanation: "For the reasons appearing in the motion for summary judgment filed by defendant, Pride Restaurants, LLC, and elaborated in its evidentiary submission and accompanying brief, the court finds that there are no genuine disputes of material fact, so that defendant is entitled to judgment as a matter of law. The court sees no purpose in writing an opinion that simply reiterates the undisputed relevant evidence and the propositions of law

8

contained in defendant's submissions, with which the court agrees and which the court adopts."

In response to the order, Hulsey moved pursuant to Fed. R. Civ. P. 54(b) for certification for interlocutory appeal of the judgment insofar as it concerns the Title VII claim. The district court granted that motion, entering final judgment in favor of Pride but staying proceedings against Garrison (the defaulting defendant) until this Court decides Hulsey's appeal.

### III.

"We review a district court's grant of summary judgment <u>de novo</u>." <u>Knight v. Baptist Hosp. of Miami, Inc.</u>, 330 F.3d 1313, 1316 (11th Cir. 2003). In doing so, we "view all the evidence, and make all reasonable factual inferences, in the light most favorable to the nonmoving party." <u>Id.</u>

Our task in this appeal is not made any easier by the district court's order. We recognize that, generally speaking, findings of fact and conclusions of law are not required in orders disposing of a case on summary judgment. <u>See</u> Fed. R. Civ. P. 52(a). But they sure are helpful. As we have explained: "[i]n the final analysis appellate review of what the district court did is largely an error-correcting function. Ordinarily the appellate court is given the tools to determine if the trial court acted correctly. The unexplained summary judgment order not only denies

9

to the appellate court the tools of review but conceals what the court did and why and leaves the appeals court, like the proverbial blind hog, scrambling through the record in search of an acorn. This is antithetical to proper performance of the review function." Clay v. Equifax, Inc., 762 F.2d 952, 957 (11th Cir. 1985).

While we have said that the absence of findings of fact and conclusions of law "is not, of itself, fatal" to a district court's order granting summary judgment, we have also said that "parties are entitled to know the reasons upon which summary judgments are based, if for no other purpose than to secure meaningful appellate review." Hanson v. Aetna Life & Cas., 625 F.2d 573, 575 (5th Cir. 1980) (citation omitted).[1] Thus, "we have in practice insisted that district courts record – however informally – their reasons for entering summary judgment, at least where their underlying holdings would otherwise be ambiguous or unascertainable." Id.; see also Erco Indus. Ltd. v. Seaboard Coast Line R.R. Co., 644 F.2d 424, 434 (5th Cir. Unit B 1981) ("Although findings of fact and conclusions of law need not be included in orders granting summary judgment under Fed. R. Civ. P. 52(a), the parties are entitled to know the reasons upon

[1] Decisions of the Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

which the summary judgment was based in order to facilitate appellate review.")[2]; Boazman v. Econ. Labs., Inc., 537 F.2d 210, 213 n.5 (5th Cir. 1976) ("[W]e are authorized to set aside a District Court's grant of summary judgment when 'its order is opaque and unilluminating as to either the relevant facts or the law with respect to the merits of appellants' claim.'") (quoting Carter v. Stanton, 405 U.S. 669, 671, 92 S. Ct. 1232, 1234 (1972)).

Without the benefit of the district court's reasoning on any issue in this case, we commence our analysis on appeal at a "decided disadvantage." Mullins v. City of Huntsville, 785 F.2d 1529, 1532 (11th Cir. 1986). We do not know whether summary judgment was granted because the district court thought Hulsey failed to establish one or more elements of her prima facie case, or because it thought that Pride presented a viable affirmative defense. The district court's order does say that the court agreed entirely with the defendant's brief and summary judgment motion, but neither of those filings even addressed one of Hulsey's two theories of recovery under Title VII.

We could simply vacate the district court's order and send the case back for clarification of the reasoning, but that would only delay the inevitable conclusion.

---

[2] Decisions made after September 30, 1981 by a Unit B panel of the former Fifth Circuit are binding in the Eleventh Circuit. Stein v. Reynolds Sec., Inc., 667 F.2d 33, 34 (11th Cir. 1982).

Genuine issues of material fact precluding summary judgment for Pride exist as to both of Hulsey's theories, either one of which if proven at trial would support a Title VII sexual harassment claim judgment in her favor.

**IV.**

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Although Title VII itself does not mention sexual harassment, it has long been settled that the statutory phrase "terms, conditions, or privileges of employment" includes within its scope a discriminatorily hostile or abusive environment. Mendoza v. Borden, Inc., 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc).

To prove sexual harassment under Title VII, a plaintiff must show (1) that she belongs to a protected group; (2) that she has been subjected to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that a basis for holding the employer liable exists. Id. at 1245; Johnson v.

Booker T. Washington Broad. Serv., 234 F.3d 501, 508 n.7 (11th Cir. 2000).[3]

Pride concedes for present purposes that Hulsey has met her burden on the first three factors; this appeal concerns the fourth and fifth factors.

**A.**

Sexual harassment in the workplace can alter the terms and conditions of employment in either of two ways. One way is if the employee's refusal to submit to a supervisor's sexual demands results in a tangible employment action being taken against her.[4] That conclusion logically has to follow, because tangible employment action is defined in a way that includes a change in the terms and conditions of employment. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753-54, 118 S. Ct. 2257, 2265 (1998). As defined by the Supreme Court, a tangible employment action is "a significant hiring, firing, failing to promote,

---

[3] In Mendoza, we stated that these elements apply to sexual harassment cases in which the plaintiff is attempting to prove the existence of a hostile work environment. Mendoza, 195 F.3d at 1245. In Johnson, we concluded that the same five elements can be applied to Title VII cases where liability is predicated on the existence of a "tangible employment action." Johnson, 234 F.3d at 508 n.7; see also, Pipkins v. City of Temple Terrace, 267 F.3d 1197, 1199-2000 & n.3 (11th Cir. 2001) (citing Johnson and applying the Mendoza factors to a tangible employment action case).

[4] Like a lot of other courts, we formerly used the term "quid pro quo" to describe situations where a benefit of employment was tied to a demand for sexual favors. Since the Supreme Court instructed us that term should no longer be used in the analysis of whether an employer is liable under Title VII, Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753-54, 118 S. Ct. 2257, 2265 (1998), we have used the preferred term "tangible employment action" to refer to harassment that culminates in a discharge, demotion, or undesirable reassignment. See Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1311 (11th Cir. 2001); see also Johnson, 234 F.3d at 508 (recognizing shift in terminology). We do so in this opinion, as well.

13

reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. at 761, 118 S. Ct. at 2268; see also, Johnson, 234 F.3d at 512. An employer is liable under Title VII if it (even unknowingly) permits a supervisor to take a tangible employment action against an employee because she refused to give in to his sexual overtures. That liability exists regardless of whether the employee took advantage of any employer-provided system for reporting harassment. See id. at 765, 118 S. Ct. at 2270.

The second way for sexual harassment to violate Title VII is if it is sufficiently severe and pervasive to effectively result in a change (sometimes referred to as a constructive change) in the terms and conditions of employment, even though the employee is not discharged, demoted, or reassigned. This is hostile work environment harassment. See id. at 754, 118 S. Ct. at 2265. The supervisor does not have to be the harasser for this kind of sexual harassment to occur, although experience has proven that he often will be. Regardless of who is the harasser, the employer may be able to escape liability for a hostile environment by establishing as an affirmative defense that the employee failed to take prompt advantage of the employer's system for reporting and preventing harassment. Faragher v. City of Boca Raton, 524 U.S. 775, 807-08, 118 S. Ct. 2275, 2293

14

(1998); Ellerth, 524 U.S. at 765, 118 S. Ct. at 2270. In that respect hostile work environment harassment is different from tangible employment action harassment.

Hulsey contends that Pride is liable for Garrison's behavior in two ways because she suffered both types of harassment. She asserts she was fired and thereby suffered a tangible employment action for refusing to have sex with Garrison, her supervisor. She also asserts that before she was fired she was subjected to sexual harassment that was sufficiently pervasive and severe to create a hostile work environment.

The parties in this case sometimes refer to these two separate theories or grounds for Title VII liability as "claims" or "causes of action" – calling them, for example, the "hostile work environment claim" and the "tangible employment action claim." Whether use of this language contributed to or instead exemplifies Pride's confusion, Pride is confused. It insists that the reason it did not address Hulsey's tangible employment action theory in its summary judgment motion is that she never pleaded that theory as a separate "claim" in her complaint.

In her pleading, the details of which we will discuss in the next section of this opinion, Hulsey did enough. She was not required to plead tangible employment action as a separate claim, because it is not a separate claim. "Tangible employment action" is a label used to describe one of two ways sexual

15

harassment can rise to the level of violating Title VII. In <u>Ellerth</u>, the Supreme Court explained that labels like "tangible employment action" and "hostile work environment" are relevant only "to the extent they illustrate the distinction between cases involving a threat which is carried out and offensive conduct in general." 524 U.S. at 753, 118 S. Ct. at 2265. When courts refer to the two types of conduct or fact patterns in cases, or theories of liability, as different types of "claims," they are using the word "claim" as a shorthand – and potentially confusing – way of describing how the plaintiff contends that the employer is vicariously liable under Title VII. When we talk about tangible employment action and hostile environment, what we are or should be talking about are the two alternative ways a plaintiff may establish a basis for the employer's vicarious liability, which is the fifth factor of a Title VII sexual harassment claim. <u>See</u> <u>id.</u> at 751, 754, 765-66, 118 S. Ct. at 2264, 2265, 2271; <u>see</u> <u>also</u> <u>Johnson</u>, 234 F.3d at 508 n.7.

Where the distinction between the two types of sexual harassment cases does find its importance is in connection to the affirmative defense created by the Supreme Court to shield employers from liability when they maintain effective anti-sexual harassment policies which the plaintiff employee fails to use. This is the "<u>Faragher</u>-<u>Ellerth</u> defense." It applies only to employer liability based upon a

hostile environment theory. It has no effect upon employer liability based upon a tangible employment action theory. Faragher, 524 U.S. at 808, 118 S. Ct. at 2293; Ellerth, 524 U.S. at 765, 118 S. Ct. at 2270.

With these principles in mind, we will address both theories of employer liability as they apply to this case. Keep in mind as we do so that the case is at the summary judgment stage, and the issue is whether the evidence Hulsey has put forward at least creates a genuine issue of material fact about Garrison's behavior altering the terms and conditions of Hulsey's employment, in either or both of the ways that she contends it did.

**B.**

Pride's principal argument about Hulsey's tangible employment action theory is that we should not consider it at all, because she did not properly raise it in the district court. Pride is wrong. Hulsey's complaint plainly states that "she was terminated from her employment as a direct and proximate result of having rebuffed Garrison's advances." Pride says that is not enough because, as it points out, that allegation is not presented separately but instead is contained in the same paragraph of the complaint as the hostile environment allegations. That is true, but it does not matter.

17

Specifically, this is what Hulsey did in her complaint. After setting out earlier in the complaint the alleged details of Garrison's sexual harassment of her, Hulsey then set forward in seven numbered paragraphs, what she styled as "Count I: Violation of Title VII." The first of those numbered paragraphs incorporates the preceding ones which had specified the factual details. Three paragraphs later, still in Count I, the complaint states:

> The harassment suffered by the plaintiff was sufficiently severe, pervasive, and extreme so as to alter the terms and conditions of her employment. Further, plaintiff was terminated from her employment as a direct and proximate result of having rebuffed Garrison's advances.

In light of the earlier specification of the factual details, that is good enough.

While it may well be preferable to plead different theories of recovery in separate counts, it is not required. See Fed. R. Civ. P. 8(e)(2) ("A party may set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses."). Nor is there any requirement that they be pleaded in separate paragraphs. Hulsey's complaint, adequately sets forth her two theories of recovery under Title VII.

Not only did Hulsey adequately plead in her complaint that she was fired as a result of her refusal to give in to Garrison's advances, she also argued that theory of recovery in her opposition to Pride's motion for summary judgment. She

18

pointed out to the district court her deposition testimony in support of her tangible employment action theory, testimony which is sufficient to create a genuine issue of material fact about that theory and preclude judgment as a matter of law for Pride. In response, Pride said nothing about this theory of recovery to the district court. And, of course, the district court said nothing about it in the terse order granting summary judgment.

What the district court should have said is that Pride is not entitled to summary judgment. It is not, because if a jury finds that Hulsey is telling the truth about why she was fired, she will have established a paradigm case for holding her employer vicariously liable for sexual harassment on a tangible employment action theory. If that happens, she will win on her Title VII claim regardless of the outcome of her hostile environment theory. See Ellerth, 524 U.S. at 753-54, 118 S. Ct. at 2265; Mendoza, 195 F.3d at 1245. (Any evidence offered by Hulsey at trial to show that Garrison's behavior created a hostile environment may also be used to demonstrate his motivations for firing her.) The Faragher-Ellerth affirmative defense is irrelevant to the tangible employment action theory of recovery.

For these reasons, we will reverse the district court's grant of summary judgment and remand for a trial on Hulsey's theory that Pride is vicariously liable

19

to her for a Title VII violation she suffered because her supervisor, Garrison, fired her for refusing to give in to his sexual advances.

## C.

Hulsey was entitled to survive summary judgment not only on her tangible employment action contentions, but also on her hostile work environment allegations. To be actionable under Title VII, a hostile work environment must be both "objectively and subjectively offensive, one that a reasonable person would find hostile and abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787, 118 S. Ct. at 2283; Mendoza, 195 F.3d at 1246.

In assessing whether harassment is objectively severe and pervasive, courts typically look to: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening and humiliating or just a mere utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance. Faragher, 524 U.S. at 787-88, 118 S. Ct. at 2283; Johnson, 234 F.3d at 509; Mendoza, 195 F.3d at 1246. In considering these factors, we employ a totality of the circumstances approach, instead of requiring proof of each factor individually. Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1276 (11th Cir. 2002).

20

Hulsey has presented enough evidence from which a reasonable jury could find that Garrison's harassment of her was objectively severe and pervasive. Garrison's conduct was frequent, occurring at least 18 times during the approximately 2 to 2-1/2 weeks between his initial attempt to get Hulsey to date him and her termination on August 16, 2001. His conduct was severe, involving many direct as well as indirect propositions for sex. It included following her into the restroom, and repeated attempts to touch her breasts, place his hands down her pants, and pull off her pants. It included enlisting the assistance of others to hold her while he attempted to grope her. A reasonable employee in Hulsey's position likely would perceive this behavior to be physically threatening and humiliating, especially coming as it did from an immediate supervisor. Finally, Garrison's conduct, which often occurred while Hulsey was attempting to clean the restaurant, resulted in her having to rebuff his advances both verbally and physically, and it interfered with her work performance.

Garrison's conduct is at least as severe and pervasive as the defendant's conduct in the Johnson case, which we found bad enough to satisfy the objectively severe and pervasive standard. Johnson, 234 F.3d at 506, 509. In that case there were 15 incidents of unwelcome and inappropriate incidents over the course of four months, including sexually charged comments and gestures, "giving [the

21

plaintiff] unwanted massages, standing so close to [her] that his body parts touched her from behind, and pulling his pants tight to reveal the imprint of his private parts." Id.

Pride's contention that the conduct in this case was mere "childish horseplay between teenagers" is problematic on a number of levels. For one thing, Garrison was not a teenager. For another thing, this was not horseplay between him and Hulsey because she did not "play." According to her unrefuted testimony, Hulsey was not a willing participant in any of the conduct, she did not invite it, she did not welcome it. Moreover, these weren't merely two co-workers. They were a supervisor and an employee under his supervision, someone he had the power to fire. In a sexual harassment case the totality of the circumstances must be considered, because context is important. Considering all of the circumstances, a jury reasonably could find that Garrison's repeated improper conduct toward Hulsey was sufficiently severe and pervasive to be objectively hostile and abusive.

Pride contends that even if the conduct is objectively severe and pervasive, Hulsey still cannot succeed on a hostile environment theory because she did not meet the other requirement, which is that the victim employee have subjectively perceived the conduct to be sufficiently severe and pervasive. See Faragher, 524

22

U.S. at 787, 118 S. Ct. at 2283; Mendoza, 195 F.3d at 1246. We have said that sexual harassment is subjectively severe and pervasive if the complaining employee perceived it to be at the time. See Johnson, 234 F.3d at 509. Hulsey's deposition testimony indicates that she did. She testified that the harassment caused her emotional distress. Her words and conduct in response to Garrison's persistent advances are consistent with that. Every time Garrison made verbal or physical advances, Hulsey refused him. She told him to leave her alone, she pushed him, she elbowed him, and she even kneed him in the groin in order to escape.

Pride argues that if Hulsey had truly perceived the harassment to be severe and pervasive, she would have followed the company's internal procedures for reporting sexual harassment, or would have told someone (other than the co-workers who witnessed her protestations) about the conduct before she left. That argument is one Pride may make, but it should be made to the jury at trial. In the circumstances of this case, Hulsey's failure to report the sexual harassment before she was fired does not remove from the jury the issue of whether she perceived it to be sufficiently severe and pervasive and entitle Pride to judgment as a matter of law.[5]

---

[5]Curiously, Pride has not attempted to convince us to affirm the district court's grant of summary judgment on the ground that Pride has established the Faragher-Ellerth affirmative

## V.

The district court's grant of summary judgment is REVERSED and the case

is REMANDED for further proceedings consistent with this opinion.

---

defense by showing that Hulsey failed to take advantage of its internal reporting procedures. See Ellerth, 524 U.S. at 765, 118 S. Ct. at 2270; Faragher, 524 U.S. at 807, 118 S. Ct. at 2292. For whatever reason, Pride has not argued in this Court that Hulsey's failure to utilize its internal reporting procedures entitles it to summary judgment on her hostile environment theory. Pride's brief does highlight evidence of its policy against sexual harassment and contends that because Hulsey never reported Garrison's conduct, she failed to prove her hostile environment theory. That argument, however, goes to Hulsey's burden of showing that the harassing conduct was sufficiently severe and pervasive. It does not express or imply that Pride carried its own burden of establishing the Faragher-Ellerth affirmative defense. See Faragher, 524 U.S. at 807-808, 118 S. Ct. at 2293 (the burden rests upon the defendant employer to prove the defense by a preponderance of the evidence); Ellerth, 524 U.S. at 765, 118 S. Ct. at 2270 (same); Frederick, 246 F.3d at 1313 (same). Complicating matters further is the fact that we do not know whether the district court based its decision in whole or in part on this defense. For these reasons, we express no view on whether the Faragher-Ellerth defense applies or has any merit under the facts of this case.

24