Meghan BUSSELL, Plaintiff–
Appellant,

v.

MOTOROLA, INC., a Delaware Corpo-
ration, Adecco Employment Services,
Inc., a Delaware Corporation, Defen-
dants–Appellees.

No. 04–12120.

D.C. Docket No. 02–60019–CV–SH.

United States Court of Appeals,
Eleventh Circuit.

July 13, 2005.

Chris Kleppin, Glasser, Boreth, Ceasar
& Kleppin, Plantation, FL, for Plaintiff–
Appellant.

Thomas Holland Loffredo, Erika Renee
Royal, Erica S. Shultz, Holland & Knight,
Ft. Lauderdale, FL, Curtis L. Mack, Di-
ana D. Suber, McGuriewoods, LLP, Atlan-
ta, GA, for Defendants–Appellees.

Before DUBINA, PRYOR and RONEY,
Circuit Judges.

PER CURIAM.

Appealing the district court's grant of summary judgment to defendants Motorola, Inc. and Adecco Employment Services, plaintiff Meghan Bussell claims that genuine issues of material fact exist as to her hostile work environment/sexual harassment and retaliation claims under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2, *et seq.* and the Florida Civil Rights Act, as codified in Chapter 760 of the Florida Statutes. We affirm.

The following detailed facts, primarily taken from Bussell's deposition, are viewed in the light most favorable to her. Adecco is a staffing company that provides temporary employees to corporate clients. Motorola was one of Adecco's clients. On May 3, 2000, Adecco hired Bussell, then 19 years old, as a temporary employee to work at Motorola's assembling factory in Plantation, Florida. Bussell's job duties primarily included assembling and repairing two-way radios and cellular phones, and assisting with quality control and other special projects. Bussell's immediate Adecco supervisor was Tom Karge and her Motorola immediate supervisor was Laila Pennington.

In August 2000, Bussell voluntarily requested to be transferred from the third shift (night shift) in the "Iden" Center to the first shift (morning shift) in the "Inpact" Center, which was approved by management. The work area was cramped and "tight." One Motorola employee who worked in the first shift was Bob Render, who was in his "mid-fifties." When Bussell joined that shift, she immediately felt uncomfortable around Render, finding him offensive and vulgar. She noticed that he made demeaning comments about women, and testified that Render was "always demeaning someone." He bragged to various Inpact Center employees about cheating on his wife and frequenting strip clubs.

Bussell complained to her Motorola supervisor, Laila Pennington, in late August that Render's behavior was making her "uncomfortable" and that his comments were unwelcome. She did not complain to her Adecco supervisor at that time. Although Render made "inappropriate" comments that made Bussell feel "uncomfortable," including comments on the way she looked and dressed, she did not believe she was "sexually harassed" until October 2000.

Bussell testified that in October 2000, while she was bending over to pick up radios, she "felt [Render] pulling the back of my pants down and the top of my shirt up, and like pulling—I mean, like, not just pulling a little bit, like grabbing down and yanking my shirt up and saying along the lines of nice tattoo, and I freaked out." Bussell sat down at her workstation and had a "conversation about how [she] was really upset by it" with a co-worker "for a second" and then went to Pennington's office and began "yelling" to her about the incident.

"Within the same week" of the incident, Karge and Pennington held a meeting for the "entire department," approximately 30 or 40 workers, where they reinforced the policy that there should be "no touching" or "talk[ing] dirty" in the workplace. Bussell testified that Pennington stated in the meeting that "if this happens again, it would be dealt with immediately and we won't tolerate it. We have a zero tolerance for it ... and that Motorola and Adecco had policies for sexual harassment and that we would have to abide by them." Bussell felt embarrassed during that meeting, and although she was not mentioned by name, she believed that all the employees in the meeting knew that they were talking about her. About one week after that meeting, supervisors spoke with Ren-

der, and he denied that the situation had occurred.

Bussell testified that once she had complained about this incident, Pennington retaliated against her by trying to get her "in trouble" with Karge, her Adecco Supervisor, and by conveying to Karge that she was a cry baby, and a liar. She claims that Pennington retaliated against her by assigning her an increased workload and "constantly yelling at" her. Bussell testified that the increased workload did not occur immediately after she complained about the incident with Render but instead occurred around two or a "few" weeks thereafter. After that, she noticed that "three boxes of phones" were "dumped" on her desk that she needed "to take care of."

After the "entire" department meeting, Bussell noticed Render "constantly," approximately 10–15 total times between November and December 2000, "having to walk behind my desk and rub his crotch against [her] back as he walked by, as if there was not enough room for him to get through." Bussell chose to complain only to Karge because she felt that Pennington called her a "liar" or a "baby" too much. Bussell testified, however, that she "had to tell [Pennington] what was going on" when Karge was on vacation. According to Bussell's handwritten notes, Render also made several comments to her that were "sexual in nature," including: (1) the shape of her body, including the way her clothing "compliments" it; (2) the reason why her hair grew so fast was because she must have been sexually active; and (3) she should not be with her younger boyfriend when she "could have a man" like him. Bussell did not, however, complain to management that she had been sexually harassed. In December, Bussell got "fed up," and jammed the back of her chair into Render. Render never touched Bussell again.

Bussell also had an unwelcomed experience with coworker Jason Wells. With approximately one minute left in a work day in "either late October, [or] early November" 2000, and while the shift workers were getting ready to leave, Wells walked behind Bussell, grabbed her inappropriately and began tickling her. Bussell immediately reported it to supervisors Laila Pennington and Tom Karge. Bussell testified that after she had complained to Pennington, Wells never touched or said anything inappropriate to her again. Bussell admits that none of the other employees in the Inpact Center witnessed any of the alleged touching by Render or Wells.

On December 26 or 27, 2000, Render called Bussell a "stupid girl," which precipitated Bussell yelling profanity at Render. Bussell went to Karge and the two went to Motorola's Human Resources Department and met with administrator Marcy Covington, at which time Covington notified Bussell that she would be "written up" for cursing in the workplace. It was at this time that Bussell then complained to Covington that she had been sexually harassed. Covington began an investigation, interviewing Bussell, Render and other Motorola and Adecco employees from the Inpact Center. Motorola concluded that Render, who had not previously had any complaints lodged against him, had used inappropriate language in the workplace but had not sexually harassed Bussell. Render was given a written warning, was transferred to a different department, and was placed on a one-year probationary period, which precluded him from receiving a salary increase, promotion, or transfer during that period. Bussell was dissatisfied with Render's punishment and believed that he should have been fired.

Motorola scheduled and held mandatory sexual harassment training for Render and all the employees in the Inpact Center.

Bussell testified that once she complained on or about December 27, 2000 to Motorola's Covington that she had been "sexually harassed," she did not experience any further incidents of sexual harassment. On January 24 or 26, 2001, Motorola held that mandatory sexual harassment training for all employees in the Inpact Center, including Bussell. Bussell felt that management's compelling her to attend this "four-hour" training session was "unnecessary" and in "retaliation" for her making sexual harassment complaints.

After she attended the mandatory training, she went to Karge and gave him a letter to take to Motorola's Human Resources Department. Bussell testified that Karge had refused to take the letter to the Human Resources Department. She stated the following, "He told me to stop, to get over it or get a new job. He told me to get a lawyer. He told me that if I got a lawyer, he would help me and he would testify for me as long as I didn't sue Adecco. As long as I only went after Motorola, he was going to be there for me 100 percent." She further stated that Karge gave her three options: (1) to move to Render's department; (2) stay in her current position where Pennington was the Motorola supervisor; or (3) she can find new employment. At that time, Karge also informed Bussell about a job opportunity with United Healthcare. She testified, "[B]ut what he told me was you had three choices, and of those three choices the only one that was rational was to get another job." Her last day of employment at Motorola was January 31, 2001. She found other employment immediately thereafter with CIGNA, which Adecco had facilitated for her. Bussell testified that she had wanted to become a full-time Motorola employee but that it did not come to pass because, she contended, that Motorola was tired of her complaining. According to Bussell, only a "couple" of Adecco

employees were hired as permanent employees of Motorola and no Motorola management member had ever told her that they did not hire her because she was a complainer.

The district court held that Bussell had failed to set forth a prima facie case for workplace sexual harassment under Title VII and the Florida Civil Rights Act because the alleged behavior: (1) was not "so frequent, severe, or pervasive to constitute actionable sexual harassment;" (2) was not something the "jury could construe as a pattern of extensive uninhibited sexual threats or conduct that permeated her work environment"; and (3) did not "alter[ ] her terms or conditions of employment." The district court further held that Bussell had failed to demonstrate a prima facie case for retaliation, reasoning that she had neglected to show "an adverse employment action as a matter of law and ... that she suffered an adverse employment decision on the part of either Adecco or Motorola." The district also concluded that her claim that she was constructively discharged failed because at the time she left Motorola, "by her own admission, the alleged sexual harassment had stopped."

On appeal, Bussell essentially argues that the district court misread the record and misconstrued the evidence. A careful review of the record on appeal, however, indicates that Bussell's brief represents a misreading of the record and either distorts or exaggerates the evidence and testimony in the record.

1. *Claim for Hostile Work Environment and Sexual Harassment.*

■ There was no error in granting summary judgment to both Adecco and Motorola on the ground that Bussell did not establish a prima facie case of hostile

environment or sexual harassment. There is no record evidence that the harassment for which Bussell complained was sufficiently severe or pervasive to alter the conditions of the employment and create a discriminatorily abusive working environment, in view of the precedents cited by Appellees. *See Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 582–83 (11th Cir. 2000) (listing elements for prima facie case). Render made several inappropriate, crass comments, including his talk of frequenting strip clubs and about his sex life, to several workers, both male and female, in the Inpact Center. *See, e.g., Cross v. State of Ala., Dept. of Mental Health*, 49 F.3d 1490, 1504 (11th Cir.1995) ("noting that where the conduct complained of is equally offensive to male and female workers ... [t]he sexual harassment would not be based on sex because men and women are accorded like treatment") (internal citation and quotation omitted). Moreover, because Render's boorish comments made directly to Bussell about her "thick" lips and that her younger boyfriend was a "dog" were not based on her sex, they are not evidence of sexual harassment. *See Gupta*, 212 F.3d at 583–84.

The lifting of the back of her shirt up and pulling of her pants down to view the tattoo, which precipitated Render's comment of "nice ink" or "nice tattoo," was a single incident and not sufficiently severe or pervasive to alter the work environment. Render made no sexually suggestive comments to Bussell while commenting on the tattoo. *See Gupta*, 21 F.3d at 585 (finding no sexual harassment where coworker placed hand on plaintiff's knee once and touched hem of her dress once, when the touching was only "momentary" and not coupled by any "verbal suggestions or advances"). As to the 10 to 15 instances over a two-month period of rubbing against Bussell's upper back as Ren-

der passed by her while working in the cramped and "tight," work area as Bussell testified, this too fails. In December, Bussell got "fed up," and jammed the back of her chair into Render, which ceased Render's alleged behavior. Unlike other cases in this Court, such as *Hulsey v. Pride Rest., LLC*, 367 F.3d 1238 (11th Cir.2004), where alleged sexual activities of a *supervisor* occurred over a concentrated time period, these activities occurred over a two-month period. Bussell neither identifies, nor have we found, an analogous holding that such alleged behavior is sufficiently severe or pervasive to constitute a hostile workplace sexual harassment claim. Likewise, Bussell's isolated complaint against coworker Jason Wells fails on this ground as well.

**2. *Claim for Retaliation and Constructive Discharge.***

The district court did not err by entering summary judgment for the defendants on Bussell's retaliation and constructive discharge claims. In order to set forth a retaliation claim, a Title VII plaintiff must show that (1) she participated in a protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between that protected activity and the adverse employment decision. *See Gupta*, 212 F.3d at 587. Here, there is no record evidence to support Bussell suffered from an adverse employment action by either of the defendants. We affirm this issue for the reasons set forth in the district court's order.

█ There is no record evidence to support a constructive discharge claim. A constructive discharge occurs when a discriminatory employer imposes working conditions that are so intolerable that a reasonable person in the employee's position would have been compelled to resign.

*See Poole v. Country Club of Columbus, Inc.,* 129 F.3d 551, 553 (11th Cir.1997). Bussell testified that at the time she resigned from Motorola, the sexual harassment had already stopped. There is no record evidence that she was compelled to leave Motorola at that time.

The district court's grant of summary judgment to the defendants is **AFFIRMED.**