[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-12720

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 6, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 05-02270-CV-T-26-TGW

JOHNNY JONES,
KIMBERLY SINGLETON,

Plaintiffs-Appellants,

versus

CITY OF LAKELAND,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(June 6, 2008)**

Before EDMONDSON, Chief Judge, KRAVITCH and ALARCON,[*] Circuit
Judges.

PER CURIAM:

---

[*] Honorable Arthur L. Alarcon, United States Circuit Judge for the Ninth Circuit,[*] sitting
by designation.

Johnny Jones and Kimberly Singleton, both black employees, appeal the district court's grant of summary judgment in favor of their employer, the City of Lakeland ("the City"), in their discrimination actions, brought pursuant to Title VII, 42 U.S.C. § 2000e, the Florida Civil Rights Act ("FCRA"), Fla. Stat. § 760.10, and 42 U.S.C. §§ 1981 and 1983. Upon review of the record and after hearing oral argument, we affirm.

I. Background

Viewing the evidence in the light most favorable to Jones and Singleton as the non-moving parties, the record established the following facts.

a. Jones's allegations

Jones began working for the City in 1985 in the refuse division of public works. He transferred to the Construction and Maintenance Division ("CM") in 1994 after many instances of disciplinary actions resulting from tardiness and absenteeism.[2] Shortly after the transfer, Larry Carroll became department manager in CM; Jones did not get along with Carroll, whom he believed disliked black people. Jones alleged, and co-workers James Allen and Matt Bernal confirmed, that the foremen and co-workers used racial slurs such as "spook," "nigg," and

---

[2] Jones did not believe any of these difficulties were racially motivated.

2

"monkey" and made derogatory comments at morning meetings.[3]  Although the slurs occurred on a daily basis, and Jones had received copies of the City's anti-harassment and anti-discrimination policies, Jones never filed a grievance concerning these slurs under the City's policy.

Despite the transfer to the CM division, Jones continued to face disciplinary actions.  Under the city's disciplinary policies, there was an increasing scale of punishment, beginning with oral and written warnings and ending with termination, depending on the type of infraction.[4]  In 1999, Jones received two warnings for tardiness and was demoted.  In disputing his discipline, Jones specifically mentioned racial discrimination; he did not, however, make any allegations of a hostile work environment.

Jones was disciplined again in December 2000 following an altercation with his former supervisor.  In February 2001, Jones engaged in another verbal altercation with a police officer on duty in a state building.  He was disciplined for this conduct in March 2001; Carroll attempted to discharge Jones, but the termination was reduced to suspension following a hearing.  Jones did not

[3]  Jones could not remember when the comments were made or by whom.

[4]  Group I offenses, such as tardiness, would received written warnings.  Subsequent Group I violations could receive three-days suspension or termination.  Group II offenses included abusive language to other employees.  This conduct would receive suspension, followed by termination for subsequent offenses.  Group III offenses, such as insubordination and repeated failure to adhere to policies and procedures, called for immediate termination.

experience any disciplinary actions during the next few years.

Jones repeatedly sought promotions to open positions, some of which he received.[5] In April 2003, Jones was promoted to Construction Tradesworker II. In July 2003, Jones received a written reprimand for insubordination. Although his supervisor again recommended termination, this discipline was reduced to a written reprimand.

On March 17, 2004, Jones filed a charge of discrimination with the EEOC alleging discrimination and a hostile work environment. Following its investigation, the EEOC found reasonable cause and issued a notice of right to sue.

In 2005, Jones was moved to the position of street sweeper while another employee was out on leave. Once the employee returned, Jones remained in the sweeper position and did not return to his lead position. Although he was offered a crew position, Jones declined because he viewed this as a demotion. Jones received the same grade and pay in the sweeper position.

### b. Singleton's Allegations

Singleton began working for the CM division in July 1995 as a Clerk Typist III. In 1999, she was promoted to Secretary III and Carroll became her supervisor. Her new duties included working on annual bids, typing, filing, and entering

---

[5] Jones did not assert a discrimination claim with respect to these promotion denials, as they were time-barred.

payroll. In 2001, Dorothy Fowler, who was white, took over the clerk typist position. Due to a city-wide study, both Singleton and Fowler were reclassified as Office Associate IIs.

Singleton and Fowler did not get along; Singleton believed that Fowler constantly reported her activities to Carroll and had Carroll assign Singleton clerical duties that Fowler did not want to do. Singleton also alleged that Carroll showed favoritism to Fowler, in part because Fowler was always complimenting Carroll. Carroll did not show favoritism to the other white female in the department, Sharon Siegel. In May 2003, Singleton applied for and received a transfer to another department. In preparation of the transfer, Carroll began to implement a plan to divide the Office Associate II duties to accommodate new computer systems. When Singleton later decided not to transfer, Carroll proceeded with the reassigned duties as planned.

Singleton alleged that the City attempted to create a new position in 2003. Singleton believed this new position would be a promotion, but she was denied opportunities to train for the position. In July 2003, the problems with Fowler came to a head in a staff meeting at which Carroll reassigned many of Fowler's duties, including answering the phone and sorting mail, to Singleton. Singleton complained to Carroll about the changes. She also complained in writing to

5

Employee Relations Director George Brooks that she was experiencing discrimination as a result of the re-assignment of duties and the denial of training. She did not allege that she experienced a hostile work environment.

Brooks, who is black, did not believe Singleton's treatment was discriminatory. Based on her discussion with Brooks, Singleton amended her complaint to exclude any mention of discrimination, although she orally informed Carroll's boss Rick Lilyquist of the alleged racial discrimination when she met with him on July 18, 2003 to discuss her concerns. Although Lilyquist did not believe there was discrimination, as there was no position available, Lilyquist offered Singleton the training.

Singleton alleged that she faced retaliation after her July 2003 complaint in the following ways: (1) she again was denied training in August 2003; (2) Carroll made comments related to the complaint; (3) Carroll treated her more harshly; (4) her performance evaluations were lower, which Carroll explained were due to the "confrontation;" (5) she was assigned more of Fowler's duties, moved from her office, and ordered to sit at the reception desk; (6) she was omitted from staff meetings; and (7) Carroll monitored her comings and goings and required her to keep a daily log.

In her deposition, Singleton alleged that she heard Carroll call employee

6

James Allen "possum." Carroll stopped using the term when Allen asked him to stop. Singleton also indicated that other employees had told her of many instances in which Carroll made racial slurs. Singleton did not mention these comments in any of her complaints and did not file a grievance even though she was aware of the City's anti-harassment and anti-discrimination policies; the first time she raised an allegation of hostile work environment was when she filed her complaint with the EEOC on March 18, 2004. When asked why she did not report the alleged harassment to the Employee Relations Department, Singleton stated that "it was not her fight." Following its investigation of the charge, the EEOC concluded that there was reasonable cause and issued a notice of the right to sue.

After news of the discrimination charge filtered through the office, Singleton alleged she faced further retaliation and discrimination in the following ways: (1) several co-workers called Singleton a "trouble-maker;" (2) one co-worker drafted a letter to the newspaper criticizing the allegations, and Carroll allegedly forced Singleton to type the letter; (3) in June 2004, Carroll again changed her job assignments to add more of Fowler's tasks; (4) Carroll denied Singleton's request for a transfer in August 2004; (5) Carroll denied Singleton's request to work overtime on a Sunday, instead insisting that she work her overtime on Saturday; and (6) in 2005, when Singleton requested maternity leave, Carroll made a

7

comment about women giving birth in the field and returning to work the next day. In December 2005, Singleton transferred to another department.

### c. The City's investigation

Brooks did not learn of the allegations until he received copies of the EEOC charges in March 2004. As a result of the charge, the City launched an investigation, interviewed the employees, and took remedial action. The City instructed all employees that the racial jokes, slurs, and comments would not be tolerated. Brooks also conducted workshops and held training sessions on diversity.

### d. The District Court Proceedings

Jones and Singleton filed an employment discrimination action claiming discriminatory discipline, denials of promotions, and hostile work environment based on these events.

The City moved for summary judgment against both plaintiffs. On May 14, 2007, the plaintiffs filed their opposition. Three days later, the district court granted summary judgment. Relevant to the issues on appeal, the court found that Singleton failed to establish a prima facie case of retaliation because there was no causal connection between the alleged acts and her complaints, but even if Singleton established a prima facie showing, the City proffered a legitimate

nondiscriminatory reasons for its decisions, which Singleton had not shown to be pretextual. The court further found that Singleton failed to establish a hostile work environment claim because although she had been told of comments by other employees, she never complained of the comments, and the alleged comments were neither threatening or humiliating. Nevertheless, the court concluded that the City established an affirmative defense to liability under Faragher/Ellerth[6] because it had an anti-discrimination policy, Singleton failed to use the policy, and the City took remedial action when it learned of the behavior. With respect to Jones's allegations, the court concluded that Jones failed to establish a hostile work environment because he could not identify who made racial slurs or when, his vague allegations were insufficient, and the alleged comments were neither threatening nor humiliating.[7] As with Singleton's claims, the court also found that the City established its affirmative defense under Faragher/Ellerth. Finally, the court determined that Jones failed to establish a prima facie case of retaliation because there was no causal connection between his complaint and the decision to reassign his duties.

---

[6] Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998); Burlington Indus., Inc., v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

[7] Although we find the comments objectionable, the district court's conclusion is not reversible error because Jones failed to report the slurs prior to filing his EEOC charge.

9

This appeal followed.

II. Discussion

Jones and Singleton initially raised discrimination and pattern or practice claims. They do not raise those on appeal, and thus have abandoned them. Rowe v. Schreiber, 139 F.3d 1381, 1382 n.1 (11th Cir. 1998). Accordingly, the only issues before us are the hostile work environment and retaliation claims.

We review summary judgment orders de novo, making all factual inferences in the light most favorable to the non-moving party. Danskine v. Miami Dade Fire Dep't, 253 F.3d 1288, 1293 (11th Cir. 2001).

Title VII prohibits race-based discrimination that alters the terms and conditions of employment.[8] 42 U.S.C. § 2000e-2(a)(1). An employee can establish a violation in either one of two ways: (1) through a tangible employment action - e.g., a demotion; or (2) "through creation of a hostile work environment caused by [] harassment that is sufficiently severe or pervasive to alter the terms and conditions of work." See Baldwin v. Blue Cross/Blue Shield of Ala., 480 F.3d 1287, 1300 (11th Cir. 2007). However, Title VII is not meant to serve as "a

---

[8] The FCRA prohibits employment discrimination based on, among other things, race. See Fla. Stat. § 760.10(i)(a). Because the FCRA is patterned after Title VII, courts routinely apply Title VII case law to discrimination claims brought under the FCRA. Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1387 (11th Cir. 1998). Additionally, both Title VII and § 1981 have the same requirements of proof and present the same analytical framework. Standard v. A.B.E.L. Services, 161 F.3d 1318, 1330 (11th Cir. 1998).

general civility code." See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998).

In order to establish a prima facie claim of a hostile work environment, a plaintiff must establish: (1) that s/he belongs to a protected group; (2) that s/he has been subject to unwelcome harassment;[9] (3) that the harassment [was] based on a protected characteristic of the employee ...; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.[10] Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002)

Under the fourth prong-whether the harassing conduct was sufficiently severe or pervasive to alter the terms and conditions of employment-the employee must personally perceive the harassment as severe and pervasive, and the environment must be one that a reasonable person in the employee's position would find hostile or abusive. Hulsey v. Pride Rest., LLC, 367 F.3d 1238, 1247

---

[9] The court may consider racial slurs not directed at the plaintiff or not made in the plaintiff's presence as evidence of a hostile environment. See Busby v. City of Orlando, 931 F.2d 764, 785 (11th Cir. 1991).

[10] Contrary to the City's argument, we may consider incidents occurring outside the statutory time-frame because the very nature of the claim is one of repeated and pervasive conduct. See National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116-117 (2002).

11

(11th Cir. 2004). The following four factors are important in analyzing whether harassment objectively altered an employee's terms or conditions of employment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct was physically threatening and humiliating or just a mere utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance." Id. at 1247-48. Additionally, we consider the alleged conduct in context and cumulatively, looking at the totality of the circumstances, to determine if an environment is hostile. See id. at 1248. Teasing, offhand comments, and isolated incidents do not constitute discriminatory changes in the terms and conditions of employment. Faragher v. City of Boca Raton, 524 U .S. 775, 788, 118 S.Ct. 2275, 2284, 141 L.Ed.2d 662 (1998).

Under the fifth prong, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate ... authority over the employee." Ellerth, 524 U.S. at 765. If the harassing supervisor takes a tangible employment action against the victimized employee, the employer will be vicariously liable to the employee without the benefit of a legal defense. Id. at 762-63; see also Frederick v. Sprint/United Mgmt. Co., 246 F.3d 1305, 1311 (11th Cir. 2001). Where the employee does not suffer a tangible employment action, the employer may avoid liability by showing 1) it

12

"exercised reasonable care to prevent and correct promptly any [] harassing behavior"; and 2) the employee "unreasonably failed to take advantage of any preventative or corrective opportunities [it] provided." Faragher, 524 U.S. at 807; Ellerth, 524 U.S. at 765. See also Nurse "BE" v. Columbia Palms West Hosp. Ltd. Partnership, 490 F.3d 1302, 1309 (11th Cir. 2007). As an affirmative defense, the defendant bears the burden of establishing both of these elements. See id. "[O]nce a company has developed and promulgated an effective and comprehensive anti-sexual harassment policy, aggressively and thoroughly disseminated the information and procedures contained in the policy to its staff, and demonstrated a commitment to adhering to this policy, it has fulfilled its obligation to make reasonably diligent efforts to 'know what is going on' within the company." Farley v. American Cast Iron Pipe Co., 115 F.3d 1548, 1554 (11th Cir. 1997).

Title VII and the FCRA also include a separate anti-retaliation provision prohibiting employers from retaliating against an employee "because he has opposed any practice made an unlawful employment practice" by Title VII. See 42 U.S.C. § 2000e-3(a); Fla. Stat. § 760.10(7). "[A]n employee need not prove the underlying claim of discrimination for the retaliation claim to succeed." Sullivan v. Nat'l R.R. Passenger Corp., 170 F.3d 1056, 1059 (11th Cir. 1999).

To establish a prima facie case of retaliation, a plaintiff must prove that

13

(1) s/he participated in a protected activity; (2) s/he suffered a materially adverse employment action; and (3) there was a causal connection between the participation in the protected activity and the adverse employment decision. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955, 978 n.52 (11th Cir. 2008). The phrase 'protected activity' includes formal EEOC complaints and informal complaints filed internally to the employee's supervisors. Shannon v. Bellsouth Telecomms., Inc., 292 F.3d 712, 716 n.2 (11th Cir. 2002).

This court construes "the causal link element broadly so that 'a plaintiff merely has to prove that the protected activity and the ... [adverse] action are not completely unrelated.'" Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004) (modifications in original) (citation omitted). Furthermore, a causal connection is established if the plaintiff shows that the decision-maker was aware of the protected activity and the protected activity is not wholly unrelated to the adverse action. Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 590 (11th Cir. 2000). "For purposes of a prima facie case, 'close temporal proximity' may be sufficient to show that the protected activity and the adverse action were not 'wholly unrelated.'" Id.

This court has held that a three month period between the protected activity

14

and adverse action "does not allow a reasonable inference of a causal relation between the protected expression and the adverse action." Higdon, 393 F.3d at 1221.

If the plaintiff establishes a prima facie case, the burden shifts to the employer to proffer a legitimate, non-discriminatory reason for the adverse action. Crawford v. City of Fairburn, 482 F.3d 1305, 1308 (11th Cir. 2007). If the employer meets this burden, then the plaintiff must show that the employer's proffered reason is mere pretext for retaliation by presenting sufficient evidence "to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997). Conclusory allegations, without more, are insufficient to show pretext. Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1376 (11th Cir. 1996). Instead, the plaintiff must meet the proffered reason "head on and rebut it." Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc).

After a thorough review of the record and upon hearing oral argument, we conclude that there was no error in the district court's order granting summary judgment. With respect to the hostile work environment claims, although Jones and Singleton were aware of the City's anti-discrimination and anti-harassment

15

policies prior to their EEOC complaints, neither filed grievances alleging a hostile environment, and this failure is fatal to those claims. Moreover, once the City learned of the allegations following the EEOC charge, the City investigated and took prompt remedial action. Finally, Jones's and Singleton's alleged instances of retaliation are either too far removed from any complaint to establish a causal connection, or are justified by legitimate, non-retaliatory reasons, which the plaintiffs failed to show were pretextual. Accordingly, we AFFIRM.